Gaston, J.
 

 This bill was filed on the 20th of February, 1838, and in it the plaintiff, Lewis Sasser, sets forth, that Arthur Jones, senior, of the county of Wayne, was in .his life-time possessed of a large real and personal estate, and that, beingoíd and extremely infirm, he was desirous to make a settlement.of all his estate, whereby, after securing ¿a provision to himself -for a comfortable support during the residue of his lite, he might, subject to that provision, divide the whole in equal portions between his five children, viz, Arthur Jones, Jun., Lydia Jernagan, wife of Richard Jernagnn; Sarah Langley, wife of Bryan Langley; Nancey Howell, wife of Cullen Howell; and Charlotte Smith, wife of Saunders Smith, and his grand-danghtcr Polly Sasser, the wife of the plaintiff, for and during .the life of said Arthur, and from and after his death it might be equally divided between his said children and grand-child absolutely and forever___ The plaintiff further sets forth that, for the purpose of carrying this intention into execution, the said Arthur Jones, Sen., Arthur Jones, Ju.n., Richard Jernpgan, Bryan Langley, Cullen Howell, Sanders Smith and Lewis Sasser, did, on the 11th of August, 1829, execute a certain deed, (whereof a copy is annexed to and made part of the bill of complaint,) of which the material proyisions are as follows ;
 

 The instrument begins thus: “I, Arthur Jones, Sen., do agree and make the following propositions, viz: to divide my estate between my five children, namely, Arthur Jones, Jun., Lydia Jernagan, Sally Langley, Nan.cy Howell apd Charlotte Smith aud my grand-daughter Polly Sasser, in the following manner, divided by Sampson Lane, Micnjah Cox, William Raiford, John Eenneday, and John Wright, in equal lots, viz: I lend to my son Arthur Jones, Jun., the following property, his equal proportion in the division made by said committee, that may be attached to his drawn number, consisting of the articles as follows.” The articles so lent arc then set forth and described, and .consist of several
 
 *21
 
 fields called by their -espective names, and the following negroes: “Raiford, Milley and Mitchell, my grey mare and cripple mare, and the crop on the James Jones field and my Island field.” In the same language the instrument proceeds to set forth the loan to the said Arthur Jones, Sen’rs daughter Lydia Jernagan, “ consisting of the articles as follows,” mentioning several fields by their names and “the following negroes : Martin, Amie, Guilford, Hannah, Dave, my horse mule for which
 
 he
 
 pays Cullen Howell five dolíais on the 1st of January, 1831, and the crop on the Rye patch field and crib field at said Fellow’s place.” Next follows in the same words the loan to the daughter Sally Langly, consisting of certain fields therein named, and “ the following negroes: Lake, Phillis, Pat.sey and Isaiah, and my Musgrovo mare and the crop on the Coor place, for which
 
 he
 
 pays five barrels of corn to Cullen Howell out of the present crop, and five barrels tp Arthur Jones, Junior.'’’ Next is the loan in the same words, except that it is described as her'equal proportion in the division made by spid committee that
 
 is
 
 “attached,” not that may be attached, “ to hep drawn number, consisting of the following,articles.” Thes.e are described in certain fields by particular names and “ the .following negroes, Ben. Cha.ney and William, and my old horse and -my crop on the house field at the Fellows place and the Tom Coor orchard.” The loan to Charlotte Smith, the youngest daughter, then follows in the same words as the last, “consisting of the following-articles: the Sharper new ground, the lower field and Island field at the Fellows place, and the following negroes: Leah, Esther, Jack and Rose, and my big mare for which /repays Cullen Howell two dollars the first of January, 1831, and the crop on the corner field and the Sharper new ground for which he pays five barrels of corn to Arthur Jones Sen.” Then follows the loan to the Grand-daughter, the plaintiffs wife, Polly Sasser, in the same language, consisting of th.e following articles: “certain fields by name, and “the following negroes, Sam, Eliza and Nathan and my grey mule for which
 
 he
 
 pays Cullen Howell five dollars on the .first of Jan
 
 *22
 
 I83Í, and the crop on his own land and the broke np field.” This instrument proceeds to declare the condition A of the above loans as follows: "that each of my children or t¡ie¡r hnsbandc>, that is willing and will comply u ith the following terms, shall have and receive as above loaned, on condition that they pay me, Arthur Jones, Sen. annually what said Committee think sufficient to support me and that property Í have secured for my own use during my life, and to pay a note I, Arthur Jones, Sen. owe to Saunders Smith, he, Smith, discounting his proportion of said note and delivering it to said Arthur Jones, Sen. at or before the signing of this transcript; keep up all my fenceson their aforesaid loaned parts of my lands, pay the tax of the negroes they have in possession and equally the tax of all my lands; and if either of my children fail to comply with these terms or attempt in any way to conceal or make away of any of the above named proporty.it is and shall be in the power of said committee to investigate said offence; and if, on full investigation, should find him or her guilty of said offence, shall, two or more of said Committee, take possession of such property loaned to him or her aforesaid, and dispose of it as I, Arthur Jones, Sen. direct; and I further promise and agree that this agreement shall continue in full force from year to year or until a majority of said .committee shall find it advisable to alter or do away said agreement; and I further wish the above named Committee to divide my property both real and personal if I should not live to see the expiration of said loan, which loan is to stand in full force until the first of January, 1831, and as much longer as said Committee or a majority think it advisable as above stated — all power resting and forever to rest in a majority of said committee — and I further enjoin it on my grandson-in-law Lewis Sasser and his wife Polly to come and live with and 'cherish me in my old age, and see that the property .which I reserve for my own use is properly managed, ibeing .old and infirm and not able to attend to it myself.” This instrument is sealed by Arthur Jones, Sen., Arthur Jones, Jr., Richard Jernogan, Bryan ÜUangiey, Cullen Howell, Saunders Smith and Lewis Sasser,
 
 *23
 
 and its execution attested by Calvin Coor,and John Coor Pen der. The plaintiff further sets forth in his bill, that the parties who had executed the foregoing instrument, and the persons therein named as the committee, apprehending that the same might not fully carry into effect the wishes and intentions of the said Arthur Jones, Sen., agreed that a more perfect instrument should be prepared, which should vest the title ot the property in the persons constituting the committee, and agreed to meet on the 15th of said month, when the more perfect instrument was to be ready, and then to execute the same and finish the division of what remained undivided of the property ; and that, in pursuance of this agreement, such an instrument was prepared, and all the parties privy to the foregoing agreement met together, and that instrument so prepared was executed by the said Arthur Jones, Sen., and Sampson Lane, Micajah Cox, William Raiford, John Kenneday and John Wright.
 

 A copy of this instrument is annexed to the bill as a part thereof. The instrument purports to be an indenture executed between the said Arthur Jones, Sen., on the one hand, and the said Sampson Lane, Micajah CoX, William Raiford, John Kenneday and John Wright, “trustees of Arthur Jones, Sen.; Lydia, wife of Richard Jernagan; Sally, wife of Bryan Langly; Nancy, wife of Cullen Howell; Charlotte, wife oí Saunders Smith; and Polly Sasser, daughter of Polly, wife of Asa Jernagan, deceased ;” it recites the inability of Arthur Jones, Sen., by reason of age and infirmity, to attend to his estate as formerly, and his agreement, for the advancement of his said children, to make over his property to the said trustees, so that they shall pay his debts and afford him a maintenance as thereinafter mentioned, and then witnesseth “ that the said Arthur Jones, Sen., in order to carry said agreement into effect, and in consideration of the natural love and affection which he hath for and towards his above named children, and of the provisions, covenants and agreements therein after mentioned by the trustees of the said children to be observed and performed, hath given, granted and assigned, and doth give, grant and assign all the pro
 
 *24
 
 poriy which lie now possesses, (“ which I now possess,’*) both real and personal, to have and to hold the said property unto thesaid trustees, their executors, administrators and ass¡gns forever, without rendering any account or being therefor in any way accountable to the said Arthur Jones, Sen., for the same, and the said trustees for themselves, their heirs, executors and administrators, do (doth) covenant, promise, grant and agree to and with the said Arthur Jones, Een., in manner and form- following,- that is to’say that they, the Trustees of said children, their heirs, executors and administrators shall and will settle, pay, discharge and satisfy, or cause to be settled, paid discharged a-nd satisfied, all accounts,-debts, judgments and demands of every nature and kind whalroever now outstanding-against or duo from or payable by said Arthur Jones, Sen. or for the payment oí which the said Arthur Jones, Sen. is or shall be liable or be held liable, either at law or equity, on account
 
 of
 
 any
 
 thing
 
 hereafter had or done, and at all times hereafter to keep harmless and indemnified the said Arthur Jones, Sen. from all such accounts, debts, judgments and demands, and from all actions,- suits and damages, that may to him or them arise by the reason of the non payment thereof; and moreover thejy the said trustees of said children, shall and will annually during the term’of the natural life of the said Arthur Jones, Sen. pay to him whatever may be sufficient for his support or maintenance during life in a comfortable manner; the right and title all my property to be vested in my Trustees during my natural life, empowering my Trustees to loan to each of my children an equal part of all my estate for such time as they may think best, and after my death to make an equal di-vision of all my property both real and personal to my children as aforesaid;-, provided always and upon these considerations, thatjif the trustees of said children, their heirs, executors or administrators shall neglect or refuse to pay said accounts, debts; judgments and all demands according to the covenants aforesaid, or shall suffer the said-Arthur Jones, Sen. to be put to any cost, charge, trouble or ex-pense on account of the same, or shall- refuse to support him in a decent
 
 *25
 
 and comfortable like manner, that then, in all, any or either of the cases aforesaid, it shall be lawful to and for the said Arthur Jonas, Sen. all the premises hereby granted to take, re. possess and enjoy as in his former estate.” This instrument, sealed with the seals of the said Arthur Jones, Sen. and of the several trustees therein named is, like the former, attested by Calvin Coor and John C. Pender.
 

 The plaintiff expressly charges, that Arthur Jones, Jun., had notice of the agreement to meet for the purpose' of executing the last mentioned instrument onjthe 15'th of August, 1829, did meet with the other persons and parties accordingly, was present at the execution, and declared his approval thereof. He further sheweth, that among the negroes owned by Arthur Jones, Sen., before and at the time of the execution of this last mentioned instrument, was a boy named Shepard; that before and at the time aforesaid there was an enumeration and a list made of all the property intended to be conveyed, settled and assured by the said instrument; that Arthur Jones, Jun.,- being better acquainted than any one else with the 'state of his father’s property, aided in this enumeration; that the said boy Shepard was named by him in the presence of his said father and the trustees,-as one of the negroes tobe embraced in said settlement, and was one of the negroes mentioned in said list; that the said boy was, by the arrangement of the trustees under the Said Instrument, assigned asoné to wait Upon the said Arthur Jones/Sen. and did, continually thereafter up to the day of the said Arthur’s death, remain in'the possession of the said Arthur, who notoriously claimed and held' him as his the said Arthur’s property; and he avers distinctly that Shepard wasone of the negroes, which the said Arthur, previous to the execution of either of the instruments, did, with'the full knowledge of the said Arthur Jones, Ju n., declare'and claim to be a part of the property by the' said instrument to be settled and secured for the benefit of his children and grand child, as is therein done, reserving to- the said Arthur, Senior, the use of the said Shepard and some others during his life, giving the use of the residue during his life unto the said children and grand-child, and
 
 *26
 
 for an absolute division among them after his and insists that the instruments aforesaid, whereby such settlement was made, were executed upon valuable an(j g00(j considerations ; and sheweth that the said instruments were on the 30th of December, 1829, duly proved and immediately thereafter registered. The plaintiff also saith that Arthur Jones, the elder, at and before the execution of the said deeds of the 11th and 15th of August, 1829, was indebted to Saunders Smith, one of his sons-in-law therein mentioned, in the note which is stated in the first of the said deeds. TheBillthen states, that Arthur Jones,Senior died on the 4th of April, 1830; that' upon his death, the trustees hired out the slaves, including
 
 the
 
 said Shepard, until the 1st of January, 1831; and that on, that day, they proceeded to make the final division of all the property of the deceased among their
 
 cestuys que trusts,
 
 and, in this division, alloted to the Plaintiff, the husband of Polly Sasser, the "negro boy Shepard. It also sets forth, that after the execution of the aforesaid deeds of the 1 ith and 15th of August, 1829, that is to say, at the February Term, 1830, of the County Court of Wayne, Arthur Jones, Jun., fraudulentlyprevailed upon his father, Arthur Jones, Senior, to acknowledge in open Court an instrument, purporting to be a deed of gift from Arthur Jones, Sen., to Arthur Jones, Jun., to bear date the 6th of April, 1827, and to convey, among other property, to the said Arthur, Junior, the said negro boy Shepard; and that, subsequently to the death of his father and to ths division so made by the trustees as aforesaid, he has instituted an action of detinue against the plaintiff for the said negro, which action, originally brought in the County Court of Wayne, has been-earned by appeal to the Superior Court of said County, and thence- removed to the Superior Court of Lenoir, where itisstill pending; that several other actions at law have been instituted, and are pending between the said Arthur, claiming title to negroes under the said alleged- deed of gift, and others claiming under the deeds of the llt-h and 15th August 1829, and the division so as-aforesaid- made by the trustees under the said deeds: and that the parties in these
 
 *27
 
 last mentioned suits have entered intoan agreement, by which their claims are to be determined by the division, which may be made in this suit between the said Arthur and the plaintiff.
 

 The Plaintiff charges, that the said pretended deed of gift was not executed as a deed, previously to the acknowledgment thereof in Febr., 1830, but alleges, that in fact one Calvin Coor, having been requested by Arthur Jones,'Sen., some time before the day on which it bears date, to. draft an instrument for the conveyance of a portion of his estate to his son, wrote the said instrumnet,-and presented it for execution; that the said Arthur refused to execute it, because it contained more property than he was willing to convey; that the said Arthur, on consultation with a friend, Lodowick Alford, was informed that the instrument would not be binding unless it was delivered; that he might sign it, and afterwards, upon due deliberation, might either deliver it,whereby it would become binding, ordestroy it; that in pursuance of this advice, he did sign the instrument, and, without a delivery thereof caused it to be deposited with other papers in his chest; that afterwards having determined to destroy it, he directed his said son to go to his chest and get it for him, handing to his son the key of his chest for that purpose; that his son opened the chest and took it out, and then delivered to his old father another paper, which the latter supposed to b® the instrument aforesaid, threw into the fire and burnt.
 

 The plaintiff in his said bill insists further, that, even if the said alleged deed of gift was
 
 Iona fide
 
 executed before the said deeds of the 11th and 15th August, 1829, yet that the defendant, having deliberately and with a full knowledge of the objects and purposes of the said deeds, and that the said negro was part of the property thereby intended to be limited and secured, actually executed the one as a party thereto and assented to the execution of the other by his trustees, is concluded thereby from asserting his title at law to the said negro, to the injury of the plaintiff, also a party in like manner, to the said deeds. The plaintiff prays that
 
 *28
 
 the defendant may be enjoined from prosecuting his said claim at law and for general relief. Upon the filing of this bill, a special writ of injunction was ordered to issue, whereby the defendant was restrained from prosecuting his said suit further than unto judgment. The defendant put in his answer on the 5th July, 1838.
 
 Therein the defendant
 
 admits, that, at the time of the transactions mentioned in the bill, his father, the late Arthur Jones, Sen., was aged and infirm, having attained at the time of his death the age of
 
 72
 
 years and having the ordinary infirmities, but no more than the ordinary infirmities, incident to that age; that his said father was illiterate; that he was possessed of property, (including therein what was given to the defendant) to the amount of $35,000, and saith that all this property his father had accumulated in the course of a very laborious life; and that in making this accumulation, his father was greatly assisted by this defendant, who lived with his father until alter he had attained 45 years of age, and from the moment he was able to labor, had worked for his father most diligently and faithfully, as a labourer and overseer, and had never received any compensation for his services, except between three and four months schooling. The defendant further saith that his father being conscious and having often so declared, that the defendant by his faithful labors and services made in fact a large part of the property so accumulated, had deliberately resolved greatly to prefer this defendant to his other children in the distribution of his property; and, to carry that resolution into effect, executed in the year 1826 his last will and testament, whereby he devised unto this defendant the same land, which is contained in the deed of gift hereafter particularly mentioned, and the negroes with the exception of one or two changes, which were made to keep families together, and that, tp the best of this defendant’s recollection, Shepard was one of the negroes so bequeathed; that after the execution of the will it was reported to the testator that Bryan Jernagan, one of his sons-in-!aw, had complained of the dispositions therein made, and had said that, a will was not a firm conveyance and
 
 *29
 
 might be set aside; and that in consequence thereof he termined to make the provision, which he intended for this defendant, by deed; that in pursuance of this purpose the instrument of the 5th of April 1827, wherein the negro boy Shepard with other parts of the property ol defendant’s father, constituting in value about one half of what he was worth, was conveyed to this defendant, was prepared and executed, that defendant was not present at the execution, being at that time out at work, but has learned and believes that it was executed at the house of his father,’ in the presence of Lodowick Alford,a highly respectable man and neighbor of his father, of Galvin Coor and of the plaintiff’s wife,the defenant’s sister Pollyjthat on defendant’s return to the house his father told him that Calvin,(meaning Calvin Coor)1 had brought “the deed,” “or your deed;” that defendant asked where it was, the old man pulled it out of his pocket and handed it to him, and stated that he had got Lodowick Alford and Calvin Coor to witness it, that they would do as well as John and Blaney, (meaning John Coor Pender and Blaney Coor whom he had intended to get as witnesses) and the defendant put the deed in his pocket; that in a day or two thereafter Calvin Coor passed, the house of said Arthur, Seri.> on his return home, and the old man seeing him, told him to get down and come in; that the said Calvin accordingly came in, whereupon the old man told him he had given defendant his deed, and by direction of his father, this defendant hand, ed Coor the said deed for the purpose of being read, and accordingly Coor read it aloud two or three times in the presence and hearing of the old mail and this defendant; after reading the deed the said Coor threw it on the table, towards the old man, who pushed it towards this defendant, and defendant took it and put it in his pocket, and the defendant has said deed ready to be produced, and annexes a copy thereof to bis answer, and prays that it may be taken as a part thereof. This instrument bears date the 5th of April 1827, purports to be sealed by Arthur Jones, Sen., whose mark is attached instead of signature, and is attested by Cal. vin Coor and Lodowick Alford in these words: “signed and
 
 *30
 
 acknowledged in presence of us, who were present at the time of assigning;” and declares, that in consideration of the natural love and affection which the donor bears to his son Arthur, and for the advancement and preferment of the latter in life, he doth give unto his said son, several certain tracts and parcels of land situate as follows, being, as well as can be ascertained from the deed, six distinct tracts or parcels, also the following eleven negroes: Luke, Ben, Raiford, Martin, Tener, Milly, Esther, Shepard, Mason, Lewis and Chaney, also two thirds of the negroes which fell to the donor by the death of his son Willis, the negroes named Daniel, Penny and Bill after the death of the said Willis’ Widow; also “three thousand dollars in money to be paid him by my executors twelve months after my death, I also g[ve him four horses and two mules to be distinguished as follows, the mare called his, named Peg, and her mule; also an one-eyed horse called Boston, and the gray mare and her mule, and the young Truxton horse named Radnor, I also give him myfarming tools, and blacksmith’s tools and Dutch fan, I also give him fifty barrels of corn to be delivered him by my executors at the Fellows place crib and twenty five at the old place, to be delh'ered at the said crib, also three bladestacks of fbdderhis choiceat the Fellows place,and two his choice at the old place,” with a formal
 
 habendum
 
 ot all the things given and their appurtenances, and the deeds, evidences, and writings concerning the same unto his said son, his heirs and assigns forever, and a covenant of warranty against all former gifts, grants, bargains arid sales by the said donor heretofore made and all persons claiming or to claim under him. The answer states that in June, 1827, in consequence of some disagreement between his father and his wife, he moved away from his father and, has not since lived with him; that ypon his movingaway Saunders Smith and his wife went to live with his father, and, upon their moving away, the plaintiff Lewis Sasserand his wife took up their abode with him. The defendant also saith, that there was an under. slandingand agreement between him and his father, that, notwithstanding the deed ofgift, his father wasto retain'the posses
 
 *31
 
 sion of all the property thereby con veyed as long as he ed, and'that the deiendant should, whenever called upon, execute a bond to secure to his father the use and possession thereof; that the defendant was never required to give, and therefore did not give such a bond, but in the true spirit of his said agreement he left the use and possession of all the said property with his said father. He further saith, that he is an illiterate man, unacquainted with the legal operation of instruments, and that, having been requested by one of the Trustees, Mr. Wright he believes, to sign the deed of the 11th August, 1829, before complying therewith he sought an interview with his father, and represented to him that they were both ignorant men and that defendant was afraid, if he signed any writing, about the property, it might hurt
 
 his,
 
 defendant’s, deed of April, 1827; upon which his father1 assured him that he was not to be injured thereby, that signing the said deed would not hurt his right, that the object of the instrument prepared was to loan out his property until January, 1831,- and, if then satisfied therewith, to continue it from year to year as long as he lived; that hedidnot wish any-of his property to
 
 go
 
 to pay the debts of Jernagan and Lang, ley; and that thereupon and upon faith in his father’s assurances, the defendant did affix his signature to that deed. He further saith, that, [having learned by consulting a person in whom he had confidence, that
 
 his
 
 deed was a good one,, and that it was not essential that it should be put upon record immediately, and knowing that his father preferred hi» not making the same public, lest he should be harrassed by his other children and their husbands, he rested content therewith until the transactions of August, 1829, having only shewn the same to a few particular friends, among whom was Calvin Blackman now deceased but theu sheriff of the county of Wayne, and who was examined as a witness on the trial of this suit in the County Court;, but on the 11th of August “ beiug jealous and apprehensive he did inform some of the trustees, or one of them, (either John Kennedy or John Wright) that he had a deed for a considerable portion of said property, and that at a proper time
 
 *32
 
 would show it — “that nevertheless he did no more, because felt himselt bound not to interfere with any disposition which his father might make of his property for
 
 his life fime
 
 on account of his agreement that his father might retain a life estate therein, and because he thought nothing more necessary to be done by him by reason of the assurances so received from his father. The defendant admits the execution of the'deeds of the 11th and 15th of August, 1829, but insists that no more was intended thereby on the part of his father than an arrangement to continue in force from year to year so long as he lived, whereby a comfortable support might be assured to him during the remainder of his days, his debts paid out of the proceeds or income of his property, and at his death such property as he then owned might be so secured to his daughters,'as to'prevent its being taken to pay the debts of their husbands, two of whom, Langly and Jernagan, were insolvent and indebted, among other creditors, to Lane, Wright and Kennedy, three of the Trustees, one of whom, Wright,'was active in drawing and pnrsuading the old man to sign said deeds; and that he is Confirmed in this belief of the intention and object of his father, in having the said deed's prepared and executed, by information which he has received from both the subscribing witnesses thereto. He admits that hi's father did retain possession of Shepard during his life, but aVers that he held said Shepard under theagreement with (his defendant asaforesaid, and'therefore as the bailee of this defendant, and therefore insists, that, as the deed of the 15th August does not
 
 specify
 
 any prbperty, it does not, under its general terms, “all the property whereof I am possessed,” embrace the said negroes; he also admits that his father died at the time alleged in the bill, and that, after his death, the trustees,- professing
 
 to
 
 act under the deed of the 15th of August, undertook to divide all the property whereof the deceased was possessed, including that whereof he was so possessed as
 
 the
 
 bailee of this defendant, and under that division allotted the negro Shepard to the plaintiff. He says that he has no recollection of having furnished a list of the negroes of his father including
 
 *33
 
 Shepard to be inserted in the deed of August 15th, admits that his father was indebted to Saunders Smith as stated in the deed, and owed some other small debts not exceeding in the whole $50, which he states were paid off equally by the children and grand-child,
 
 he,
 
 paying his part; and denies that he ever heard any declaration.of his father ordirection given, that his whole estate including Shepard should be conveyed and assured to the purposes set forth in the deeds. The defendant denies that he fraudulently procured the deed of gift of the 5th of April, 1827, to be acknowledged by his father,- but declares that the facts in relation thereto are as fellows ; “After the execution of the deeds of the 11th & 15th of August, 1829, the said Arthur, Senior, understood that the trustees had sent the said deeds to Raleigh to be proved before one of the Judges of the Supreme Court, and expressed great uneasiness and dissatisfaction at having signed the same, particularly as he bad understood that he could not revoke or alter the same ; he went so far as to employ counsel and pay a fee to have a bill filed against the trustees to annul the said deeds, and, but for his death so soon thereafter, this defendant believes he would have done so ; and at or about this time, he, of his own accord, requested this defendant lo bring his deed to the next court, (February Term, 1830,) which he did, and his father having received said deed from him, went into court unattended, and acknowledged the execution thereof, and afterwards declared that he had never done any act with greater satisfaction. The defendant further saith, that at the last March Term of Lenoir Superior Court, he recovered a judgment against the plaintiff in the action stated in the bill to be therein pending; and he admits the several other actions named in the bill to be yet undetermined, awaiting the final decision of this cause. He denies that he obtained possession of his deed in the manner charged by the plaintiff, but avers that he received it directly from his father; denies,- that to his knowledge or information his fathe'r objected, as charged, to the execution of that deed when presented to him for that purpose, or that Lodowick Alford gave his father the advice,
 
 *34
 
 as charged in the bill, to sign it, and either deliver or destroy it as he should afterwards determine, but avers that he hath understood and believes, that, upon stating to said Alford the motives which prompted him to make the deed, said Alford highly approved thereof, and advised him to execute the deed. He further saith that he and his father kept their papers in the same chest as a common place of deposit, and that, upon one occasion, when he came to his father’s house, while Polly, the wife of the plaintiff lived there, he learned from her that his father had been to the chest, taken out some papers and burned them, became uneasy, lest his father, who was then displeased with him, might have burned this deed, but, upon examination, finding that this had not been done, and that another paper of his of little consequence was missing, expressed an opinion, which was conjectural only, that he had burned this, mistaking it for the deed ; and declares that his father never did ask him for the deed for the purpose of destroying it, or of depriving him of bis property therein. He denies that he made any agreement or gave any assent to the making of any deed, either on the 15th of August or any other time, whereby his right to any of the property conveyed in the deed of gift to him was to be impaired or divested, and while he admits that he knew of the previous agreement to meet on that day, with a view to an arrangement of his father’s affairs, denies that he had any knowledge of the nature of the deed or settlement, which the trustees had concluded to prepare, further than the wishes, which he understood his father wanted to have carried into effect, and which he believes were not carried into execution by that instrument; denies also that he was privy to the consultations in relation to said instrument, and avers, that, when he heard it read, which he admits he did after its execution, he did not understand, nor does he now understand it; but this he knows, that, if it has the operation claimed for it by the plaintiff, his father did not intend to execute such a deed.
 

 Upon the coming in of this answer, it was moved by the defendant’s counsel to dissolve the injunction, which had is
 
 *35
 
 sued upon the filing of the bill. This motion was granted ; and the plaintiff entered a general replication to the answer, At the same time, upon an affidavit of the plaintiff, a special order was made for securing the negro after he should be delivered by the plaintiff, and the amount of hire recovered as damages, so as to await the final decision of this cause. In the mean time the original defendant died intestate, and the cause was revived against Alley Jones, his administratrix, and, the parties having taken all their proofs, the cause was set down for hearing and transmitted to this court.
 

 The first question of fact, upon which the parlies are at issue, is in relation to the execution of the deed of gift to the defendant. Its attestation in the special manner therein stated, we have seen, is by two witnesses, Calvin Coor and Lodowick Alford, the latter of whom is dead. The former has been examined for the defendant, and his testimony is precise and circumstantial. He states, that, about the last of March or first of April, 1827, passing by the house of Arthur Jones, Sen., he called in, and was requested by Mr. Jones to write a deed of gift from him to his son Arthur ; that, it being too late to do the business then, the witness requested the old man to give him the boundaries of the land and the names of the negroes, and he would write it at home. The old man did so, and requested the witness, when he had written the deed, fobring Blaney Coor and John Coor Pender to witness it; that, having written the deed on the 5th of April, 1827, he left home to visit one of his aunts, and, on his way, called in at Mr. Jones’, and to'd him that he had brought the deed, but had not seen Blaney Coor or John Coor Pender ; that he read the deed to Mr. Jones, and while they were talking' upon the subject Lodowick Alford came in, and he said that Mr. Alford would witness it, to which the witness assented ; that the old man explained to Alford what he was about to do, to give some property to his son who had worked very hard for him and had never received any thing; said that he had made a will some time before, and Bryan Langly and Richard Jernagan had laugh-
 
 *36
 
 and talked about upsetting it; that he wished his son to have the property, and they might pick a flaw in the will; that the property was about the same given to his son in a wjj[ mac¡e ¡n December, 1826; that Arthur was his only son, and liad made nearly all the property, and that he thought he ought to do more for Arthur than any of the rest of his children ; that the witness thereupon read over the deed to him again, and, thereupon, he made his mark in the presence of witness and Alford, who then attested it at his request. Witness left the deed with him and went on his journey. No other persons were present but the old man himself and Alford. On the next day but one, the witness was returning, and saw the old man and his son in the piazza, when one of them, as he thinks the son, called him, and he went in. After being seated there some time, the father told witness that he had given his son his deed, and witness asked young Arthur how he liked it, to which the latter answered that he did not know, for he could not read it; the old man then told his son to get the deed and let the witness read it to him, whereupon young Arthur took it out of his breast coat pocket, handed it to witness, and witness read it to him once or twice and then threw it on the table, and the old man pushed it towards Arthur. In answer to a cross-interrogatory he adds, that he
 
 thinks
 
 young Arthur then took it. Witness, both then and before, was requested by the old man not to say any thing about it while he lived, for it might offend the rest of his children ; said further that he had intended to reserve a life estate in the property by the deed, but understood that it would not stand in law. “ Arthur then promised to let him keep the property his life-time, and told him he would give him a bond to that effect, and witness left them and saw no more of the deed until after it was proved.” The defendant has also examined Isaac Wise, who deposes, that, in the year 1827, old Arthur Jones told the witness that he had made a deed of gift to his son Arthur for the Fellows place and several negroes, (of which he remembers Shepard and Esther,) but that the old man was to have the use during his life; that Arthur Jones, the
 
 *37
 
 son, has often told him that he had a deed of gift for the Fellows plantation and a part of the negroes, and further told witness that at one time he thought the old man had destroyed the deed, but that he aftem ards found it, put it in a handkerchief and carried it tied to his back for several months. When cross-examined, the witness says, when he had the conversation with the old man, young Arthur lived a part of the year with Mr. Raiford, and a part with James Rhodes ; and on being asked whether he had never told any person that Arthur Jones, Junior, had often been - at him to become a witness, and that he had said he knew nothing about the affairs, he replies that if he ever did he does not now recollect it. On the part of the plaintiff has been examined Sampson Lane, whose testimony in relation to the fact of the execution of the deed is very much at variance with that of the principal witness of the defendant. This witness testifies, that at the Spring Term, 1830, of Greene Superior Court, which court must have taken place very soon after the death of Arthur Jones, the elder, Calvin Coor asked the witness what he thought of Arthur Jones’s (young Arthur’s) deed; to which the defendantsaid he could not answer unless he knew one thing, and even then he might not be lawyer enough to answer; Coor asked what that was, and witness said it was the delivery of the deed from old Arthur to young Arthur; Coor then said he wrote the deed at his own home, and going to his aunt Jones’s he took the deed in his pocket, and when he got opposite the old man’s house he alighted and said, uncle Arthur I have brought the deed, and that old Arthur said to him, Calvin, read it; that the old roan said to him, Calvin, I cant sign it, it gives too much, it gives most half of what I’ve got: that Calvin then told him that he wrote it agreeably to instructions; that the old man then said to him, Calvin, read it slow ; that he then read it a second time, and the old man made the same reply, I cannot sign such a deed ; that at that time Lodowick Alford passing by, he said to the old man, yonder is Alford; that the old man said tell him to stop and come in, and that Alford came into the piazza;
 
 *38
 
 £[laf ¡hen himself or old Arthur said, here was a deed, and the old man was unwilling to sign it; that Alford asked to have the deed read ; that after it was read, the old man said “in the name of God I can’t sign it, it gives too much ;” that Alford then said, Uncle Arthur, you know-young Arthur has done a good deal for you, you might as well sign it; that the old man said it was too much; that Alford then observed to the old man, you can keep the deed, and if you think proper you can destroy it and make another at any other time; aud that, upon that statement, the old man signed it; that Coor further told this witness that no one was present but old Arthur, Alford and 'himself, and that after the old man had signed the writing, he, Coor, “folded it up and gave it to the old man, and that he, Coor, never saw the deed more till it was brought into court and acknowledged,” and that from conversations, which occurred afterwards, he thought the deed was destroyed ; that the witness said to Coor he thought delivery was necessary, and Coor replied that delivery was never made in his presence. It is further testified by a number of witnesses, who concur in the same account, that on the week before this conversation with the preceding witness, which was that of Wayne Superior Court, the trustees of Arthur Jones had become alarmed at a report, that young Arthur was about to run away the negroes, and applied to a gentleman of the bar for advice; that this gentleman enquired if Jones or any confidential friend of his were at court; and, on being informed that Calvin Coor was there, he was sent for and enquiry was made of him respecting the deed of gift under which Jones set up title, and Coor was asked whether he could prove the deed, and he declared that “he could, not prove the deed,” “ he could not prove the delivery.” William Thompson testifies that, about the time that he, as sheriff, served the writs in the several suits brought on account of these negroes, which must have been early in 1831, he and Calvin Coor were conversing together on the subject of the great costs which would attend such a litigation, and this witness remarked that he understood that
 
 he
 
 (Coor) was to be a witness in the case,
 
 *39
 
 to which the latter replied, “ yes, he should be a witness on both sides ; that Arthur would have him a witness to prove’ the execution of bis deed, and the heirs would have him a witness to prove that it was not delivered and in answer to a question from witness, what he thought would be the issue of the suits, Coor replied, “inasmuch as Arthur will not be able to prove the delivery of his deed, I should think his case doubtful.” William Turletan, a witness for the plaintiff, testifies that he was living with Arthur Jones, Sen.; when the deed of gift was said to have been made, but never, while there, knew or heard that there was such a deed. He states that young Arthur Jones, since his father’s death, had insisted on his going to court to prove the delivery of the deed, and in the course of the conversation on this subject, informed the witness that Calvin Coor had said, that the witness need not be afraid to go, for
 
 he
 
 was present with the witness when the deed was delivered ; that witness told Jones he had never seen the deed, and would not go; that, a few days afterwards, witness saw Coor, and told him what Jones had said about his being present with the witness when the deed was delivered, and Coor said, “Arthur had told him a lie, for that he, Coor, never saw it delivered himself.”
 

 William K. Lane testifies, that, in the latter part of the year 18130, he heard Isaac Wise state in a conversation between them, respecting the deed from Arthur Jones, deceased, to his son, that Arthur (the son) wished him to be a witness, and had asked him if he did not know something about the matter, upon which he told Jones that he did not know any thing about it, and Wise then added, with an oath, that he would never swear to any thing respecting it. There is some other testimony, but less pointed on the side of the plaintiff, which is also relied on to contradict or discredit the testimony, by which the complete execution of (he deed of gift is endeavored to be established. But we deem it unnecessary to mention it minutely, for, whatever conclusion upon the proofs we might feel it our duty to pronounce, we do not regard this disputed fact as one now to be determin-
 
 *40
 
 • ed upon the proofs. The fact of the execution of this instru'merit as
 
 a deed,
 
 and of its execution as such previously to the deed of the 15th August 1829, was directly put in issue between these parties inrthe/ suit at law. The verdict of the jury upon that issue and the judgment of the Court thereon have established that fact, and nothing has been shewn which would authorise this Court to retry it.. We hold, therefore, that the deed of gift was
 
 delivered
 
 prior to the execution of the deed of trust of the 15th of August, 1829. The recapitulation, however, which has been made of the evidence directly bearing upon the point, will be found not without its use in considering other matters, which we are obliged to decide.
 

 The next part of the transactions to which our attention is directed, is to the execution of the deeds of the 11th and 15th August, 1829; of the circumstances attending the execution of these instruments, their object, purpose, and effect. The
 
 factum
 
 of execution is not disputed, but the defendant’s answer has set up specific allegations,
 
 wherefore he
 
 ought not to be bound thereby. He alleges that he was induced to execute, as a party, the first of these deeds, and to yield a passive assent to the execution of the other, by persons professing to act as trustees for him, because of assurances from his father, in which he confided, that the purpose of the instruments was
 
 merely
 
 to make a temporary arrangement in regard to .the property so long as his father should live, and that they were not intended to impair and should not impair his vested rights under the deed of gift; and further, that he gave notice to one of the trustees at the tune of his claim to the property. Here again this defence rests on the testimony of Calvin Coor, which is in these words: “on the 11th of August, 1829, old Arthur Jones sent for me in the morning, I went, he stated to me what he wanted, he, said Arthur was not willing to come and live with him, and that he could not attend to his business and was going to loan his property fo his children for one year,perhaps by that time he should be able to attend to his business himself, and wished me if I saw that he was going, to do any thing that I thought
 
 *41
 
 wrong to tell him of it, the committee, as I think they called in the loan, were all there; John Wright, I think, was writing the loan out of doors in the yard; I went into the house to the old man and was sitting talking with him young Arthur came in and said, “Father, 1 am unlearned, and so are you, and I fear this business will have an effect on
 
 my right.”
 
 He said, “ no, it should or would not, that it was to prevent the property being taken to pay Richard Jernagan and Bryan Langly’s debts. Arthur then stated in public, that he had a right for a part of the property, and that some of them were not getting so rich as they expected, some of them told him ifhe had a right to shew it, he said it was time enough to do that yet or that he would do it at a proper time, I then witnessed the loan, I went home.” Now it seems scarcely possible to doubt, from the manner in. which these occurrences are related by the witness, in connexion with the transaction respecting the execution the deed of gift of the 5th of April, 1827, that he means to represent that the impression, made on his mind by the answer of the father to his son’s expressions of fear respecting the operation of the acts about to be done upon his right, was that the father thereby assured the son that they should not prejudice “his right”
 
 under that deed;
 
 and this we are obliged to say is the impression, which the testimony of the witness obviously conveys to all who read it. Yet, nothing is more certain, if faith can be put in testimony, than that at this time, young Arthur Jones knew, and G'oor knew, that the old man believed, beyond doubt, that the deed of the 5th of April had been destroyed. Brittain Hood testifies, that, at the May term, 1830, of Wayne County Court, (which was after the death of his father) Arthur Jones asked the witness his opinion about the deed, when the witness told him that he had heard that the deed was destroyed, or that the old man believed it was destroyed, when Jones told, him that his father did think the deed was burnt; that his father, on one occasion previous to the acknowledgment of the deed, asked him to hand him the deed from among his (old Arthur’s) papers, and that
 
 he
 
 handed from among
 
 *42
 
 father’s papers a stud horse list oí mares purposely, instead of the deed of gift; his father took the paper, threw it into the fire and destroyed it, believing it to be the deed ot gjft. anc¡ tkat ke (y0Ung Arthur) at the same time took the deed from his father’s papers without his father’s knowledge, and kept it, and that when his father executed the deeds of the 11th and 15th of August, 1829, his father was under the belief that the deed of gift was destroyed ; and that he never let his father know he was in possession of said deed, until a short- time before the preceding term, when his father acknowledged it in court. Micajah Cox testifies,that-,on the dayafter the deed
 
 of gift was
 
 acknowledged in Court, young Arthur Jones shewed it to him, and upon the witness expressing his indignation that the old man had not apprised* the trustees of the fact of such a deed, while they were aiding in the arrangement about his property, young Arthur told him not to blame his father, for his father did not know that 7ie had the deed. On a subsequent occasion, this witness declares, that Arthur told him that the old man thought- he had burnt the deed of gift, but instead thereof had burned a stud-horse paper, and that “he (the son) had taken care of the deed.” The witness, Calvin Coor, in answer to a cross interrogatory on the part of the plaintiff, whether he ever heard the old man say the deed of
 
 gift was
 
 destroyed, and, if so, whether he heard him say so before the execution of the deeds of the 11th and 15th August, answers “ that he did hear the old man say he
 
 thought it
 
 was destioyed- before the loan and deed of trust of the 11th and 15th August. 1829, but some time after the signing of the deed of gift.” Micajah Cox testifies further, that, after seeing the deed of gift, which was shewn to him, as before stated, by young Arthur, and noticing that Calvin Coor was one of the attesting witnesses thereto, he complained to Coor of his uncandid conduct in not making the fact of this deed known when the transactions of the 11th and 15th August, 1829, took place, when Coor told him that he did not then know that Arthur had this deed. The same witness deposes, that the old man made a will in June
 
 *43
 
 or July, 1829, in the presence of his son Arthur; that this will be gave his son property, equal in value to about a third of that contained in the deed of gift, and a part of it some of the negroes contained in it; that this witness was entrusted with the keeping of this will; and that, shortly before the division made in August following, he re-delivered the will to the old man who destroyed it. It is proved by several witnesses, particularly by John ’Kennedy and Sampson Lane, that in consequence of vague threats uttered by young Arthur Jones, on the evening of the 11th.of August, after the deed of that date was executed and the division made, that he would play the mischief with the estate after the old man’s death, he was asked if he had any right to any part of the estate, and, if he had, was requested to produce it, and he answered, surely he would do so at another time or at a fit time, or it was time enough yet; that some suspicions being thus excited, that perhaps he had a concealed deed of some sort, these suspicions were communicated to the old man, who positively denied that he had any deed, asseverating
 
 “
 
 in the name of God if there ever was one, there is none now, it has been destroyed long ago,. and if he has one it is a forgery.” John Kenne-’ dy testifies particularly, that on the 15th August 1829, the day when the second deed was executed, Arthur Jones, the elder, spoke to William Raiford of the threats so thrown out by his son on the day of the 11th, and specially enjoined it upon Raiford to require of his son to surrender any paper, which he might have affecting the title to the property,' and, if he refused, to file a bill against him. Besides, Calvin Coor was, according to his own account, particularly relied on by the old man to apprize him, if he were about to do any thing wrong in the matters then to be transacted. He, at least, was perfectly aware that the instruments about to be executed did profess, not only to dispose of all the property in the old man’s possession during his life, but provided for an equal division of it after his death. He knew, if the„deed of the 4th of April, 1829, was in existence, that these instruments were absolutely repugnan
 
 *44
 
 thereto, and it would have been in him an act of the grossest perfidy to his trusting friend, as wed as of injustice to all the parties concerned, not to suggest this repugnance, not to prevent this wrong, instead of concurring therein by attesting these instruments. We have no hesitation, therefore, in pronouncing, that, if, in the private conversation to which the witness Coor deposes, the words were used to which he deposes, they were intended by old Arthur Jones, and this was known to young Arthur and the witness Coor, to refer, not to the right under the deed of gilt, believed by
 
 Mm
 
 to be destroyed, but to some other claim or right. Possibly for this purpose they may have been spoken, and, if so, probably the reference was to a claim for a horse and part of the stock, which it is admitted on all hands was afterwards allowed by the old man, the trustees and the persons beneficially interested. The court is also well satisfied, that no notice was given, either publicly or privately, by Arthur Jones, Jun,, to the parties or any of them, of a claim to the property under his deed of gift, or under any other deed which can exempt him from the obligations fairly imposed upon him by his concurrence in the transactions of the 11th and 15th of August, 1829. The excuse alleged for not giving notice of the deed of gift, is, we are compelled to say, untrue. Notice of it was not forborne, because his father wished that its existence should be kept a secret from the other members of the family, but because he knew that his father believed it no longer in existence, and he wished his father not to be undeceived. Indeed, it may be remarked, that, according to the statement given in the answer of the circumstances attending the execution of this deed, all the pretences assigned for delaying its registration and withholding the knowledge of it, except from a few trusted and trustworthy friends, seem to be very flimsy. The great end, it seems, of this mysterious deportment, was to provide that no one of those interested in the disposition of the old man’s fortune should perchance hear of the transaction, lest they might be offended thereat ; and yet, according to the defendant’s statement, derived indeed
 
 *45
 
 from information, but from information which he believes to be true, one of these very persons, Polly Jernagan, the only child of the old man’s deceased daughter, and the present wife of the plaintiff, was present
 
 in propria
 
 persona, at the very transaction. No one, on examining the narrative in the deposition of Calvin Coor of the occurrences attending the execution of this deed and the statement thereof in the answer, can avoid being struck by the general coincidence between them. It is such as to leave no doubt, but that the information, on which the statement in the answer professes to be founded, was sought from this witness with great care, and meant to be most accurately set forth. How it happened, that, in stating this information, the defendant should misrepresent it in regard to the important part of Polly Jernagan being present with the witness and Alford, when the deed was read over several times, signed by the donor and attested by the witness and Alford, or, if the information so received was correctly set forth in the answer, how it happened that the witness afterwards discovered that he had given wrong information, and that no one was present thereat but the old man, Alford and himself, is not accounted for, and perhaps cannot be fairly accounted for. It is very obvious, however, that the statement in the deposition furnishes a more suitable or at all events a mor plausible case for secrecy, than that which was made in the answer.
 

 But it is also insisted in the answer, that these instruments did not conform to the wishes and instructions of Arthur Jones, Sen., who intended no more thereby than to make a loan of the property for a short time, and provision that, after his death, the shares of property that might hill to the wives of Langly and Jernagan, should be secured against the creditors of their husbands. In support of this allegation, reliance is placed on the testimony of Calvin Coor and John Coor Pender. We have already noticed all of the deposition of the former; which refers to the transactions of the 11th August, from which, it would seem, that he went off immediately after the execution of the deed of
 
 *46
 
 that date, and was not privy to any arrangement made for anol^er meeting. He states, that, on (he 15th of August, he was again sent for; and, on arriving there first, had a conversation with John Wright, who shewed him the form of an instrument prepared for execution, and wished him to examine it, but say nothing about it to the heirs ; and who stated, as a reason for wishing him to examine it, that he knew the old man would not execute it, unless it was approved of by the witness. After reading it once or twice, he was asked by Wright what he thought of it, and answered that if he were the old man .he would not sign it; and Wright replied, if Coor
 
 ¡told
 
 him so he would not. The witness then went into the house, and, at the old man’s request, every one else retired, and they were left alone. The witness then proceeds:
 
 “ L
 
 then read the blank deed over to him once or twice, and told hi-rn if I was in his situation I should not sign it, I
 
 thought it was too binding an instrument for him; he
 
 said then
 
 he
 
 would not sign it, had the trustees called in, and told them what I had said to him, and that he could not sign it. John "Wright and William Raiford, I think it was, told him I had misconstrued the deed of trust; that the object of it was to secure his property from paying the debts of Richard Jernagan and Bryan Langly ; that the other instrument, they doubted, would not secure it. Micajah Cox said it was nothing to him,.and he did not care whether he (Jones) signed it or not; but the old man said; if that was the intention of it, he would sign it. John Wright, I think it was, drew one (that is a deed) from the blank copy, and, after promising theold man he should have his property and papers any time when called for, he did sign it, and myself and John Coor Pender witnessed it.”
 

 Upon this part of the deposition, it may not be irrelevant to remark, that it removes all doubt, if any of it remained, that this witness did not understand, what is so strongly insinuated in the former part of his deposition, that Arthur Jones, Sen., gave any assurance to his son that he should do nothing to prejudice his son’s right under the deed of April, 1827. Here he is alone with the old man, acting as a
 
 *47
 
 confidential counsellor. He has read once or twice — he reads over once or twice more — the form of the instrument about to be executed, and sees that it unequivocally purports to make a disposition, not temporary but perpetual, of all the old man’s property, and he says notone word to him in relation to the deed of gift which he had made to his son for more than half of that property, or the assurance given to his son, but four days before, that nothing should be done which might prejudice the right under that gift. It is exceedingly to be regretted, too; that, instead of stating his objection to the instrument in such general terms, “ he thought it too binding an instrument for himthe witness had not entered into some explanations, or set forth his objections more in detail; for, as the deed" was not yet written, the form might have been pursuedwith such alterations or modifications as would have accomplished all that was desired, and have left the deed
 
 not
 
 too binding on the old man. But, be this as it may, the deposition is precise in charging, that one of the trustees declared the object of the deed was to secure the old man’s property from being taken to pay Langly’s and Jernagan’s debts, and that Wright promised that the old man should have his property and- papers at any time when called for. And this statement is corroborated in some degree by the testimony of John Coor Pender.- — • This witness, after proving the execution of the deed of the 11th, says, that when, on the 15th of August, the company was called in after the private conference between the old man and the witness Coor, the old man at first declared that he should not sign the deed, and said “that Calvin. Coor had told him that if he signed the deed it would take away his right to the property, and that Wright and Raiford then spoke and told the old man, that Coor had misrepresented the thing to him and that it would not take his right, and that he could, if he should be dissatisfied, have his property at any time.” And, in answer to an interrogatory whether Wright did not say that Langly and Jernagan were in debt and the deed of trust would prevent the property from being taken to pay their debts, he answers that he did, or words to that effect.
 

 
 *48
 
 On the part of the plaintiff the depositions have been ta- ' ken of each and every of the trustees, with the exception of Raiford, who is unfortunately dead, and these relate all the transactions connected with the deeds of the 11th and 15th August, 1829, in such a manner as to leave no reasonable doubt, if they be deserving of credit, that the deeds were prepared with an anxious attention to the deliberately formed wishes of the old man, and to the avowed wishes of all the persons interested, and were executed under no misapprehension of their contents or of their operation. It would be oppressively tedious to follow each of the witnesses in his narration, and it will be sufficient to set forth the substance of what they state, which is as follows: In consequence of previous invitation -all the children of the late Arthur Jones, and a number of his neighbors, met at his house on the 11th of August, 1829, to make a division of his property. This had been requested by him to be done, because, as he alleged, he was confined to his bed and not able to see to his business. When they were all assembled, he told his children, in the presence of his neighbors, what was his purpose in language to this effect: that if they would pay a small debt, which he owed to Sanders Smith, and maintain him as long as he lived, he would divide his property equally among them, by lending it to them as long as he lived, and after hi's death ts- be equally divided among them by Sampson Lane, Micnjnh Cox, John Kennedy, William Raiford, and,John Wright. This proposition was acceded to by all of them. The old man named over every one of his negroes, all the tracts,of land, the several crops, and the horses and mules, as afterwards expressed in the deed of that day. The persons selected among the neighbors for making the several allotments went over the fields and examined the crops and then proceeded to make as equal a division as they could, in which they were
 
 particularly
 
 aided by the old man’s son Arthur, and also assisted by the husbands of the daughters and grand-daughter; and, after reserving out of the negroes Tiner, Shepard, Mason, Lewis and Peggy, which it was agreed should remain with the old man to take
 
 *49
 
 care of him, the rest were.putinto lots, and the children and grand child.agreed each to take the lot that might be drawn to hold until the 1st of January,, 1831, at which time they 'were to be surrendered to the old man, if living, but, if not, all the property to be divided equally by the committee. It was afterwards agreed, upon the suggestion of Charlotte Smith, who wanted a lot in which a particular negro was contained, that they would agree as to their respective allotments without an actual draw, which was done. The deed of the 11th August, was then written and executed by the old man, his son, sons-in-law and grand son-in-law. After this wasdone, a doubt was suggested by Kennedy to Raiford, whether this deed was sufficient in law to transfer the title after the old man’s death; and this doubt was communicated to old Mr. Jones, who expressed a strong desire to have the matter done effectually: it was therefore agreed that all should meet at another day, the division of the stock which was not yet done should be made; and Raiford and Wright were enjoined to get the necessary information, so that a perfect instrument should be then executed. On the appointed day, the 15th, they all met again; the deed of the loth of August was then produced by Wright, as one which, according to the injunction on him and Raiford, had been framed as fitted to carry into effect the declared intentions of all concerned. It was read several times to the old man, who then requested all the company to retire, except Calvin Coor, and when they were readmitted, the old man said that Coor had told him the deed was too binding; that Raiford and Wright represented that it was such an instrument as they understood him to want; the property was all for his benefit as long as he lived, and at his death it was to go to his children; that Cox then said he did not care whether the old man signed it or not, it was no benefit to the trustees, but for his children after his death, which he (Cox) understood to be what he wanted; that the old man then said, “that is what I want, Micajah, and I will sign it,” and he shortly afterwards did execute it. The trustees and the children then proceeded to divide the stock, when Arthur Jones, the son, claimed
 
 *50
 
 a part as being his own: this was communicated to the father, who directed them to let him have whatever he claimed as his, which was done accordingly. After all was done, ^ithur expresed himself perfectly satisfied therewith. John Wright particularly declares, that one object of thedeed was to secure the property, so long as the old man lived, from being sold for the debts of his sons-in law; but that the old ma-a expressly declared that if, after his death, they chose to spend it, let them do it in the name of God. He declares that the deed was drawn conformably to the wishes of the old man; and, if any thing was said by any person to induce the belief in him; that it would secure the property against the debts of his children
 
 after Ms
 
 death, he has no recollection of it. Arthur Jones and
 
 all
 
 the others took the respective shares allotted them, and on a subsequent day the trustees also divided amongst them equally a considerable sura of money belonging to the old man, taking their accountable receipts therefor, and reserving about
 
 $
 
 100 for his immediate use; and after his death, they hired out the property until the 1st of January, 1831, when they made a final division among their
 
 cesluis que trusts. It is
 
 further proved by James Jones, Edward Sasser and Charles Cogdell, that after all the proceedings which took-place on the loth of August, 1829, were over, Arthur Jones, the younger, expressed his entire satisfaction therewith. The first represents him as saying that his father had done what he wanted him todo; the second repeats the same expressions in substance, and adds that young Arthur further observed, that his father had said he did not intend to give Langly or his wife any thing, for that Langly would spend it; but he was glad his father had given her a fair share, for she had worked as hard as any of the rest, and if Langly did spend it, Sally had no right to complain; and the last of them states that young Arthur went up to the house and asked his father if he was satisfied, and, being answered in the affirmative, replied, “well father, if you are satisfied, I am.”
 

 It is alleged in the answer, that, at the time of the transactions of August, 1829, some of the trustees were creditors
 
 *51
 
 of Langly and Jernagan, and it is hinted that they were induced by motives of interest to deceive Arthur Jones the elder into such a disposition of his property as might enable them to procure satisfaction of these debts. But no proof has been offered of this allegation, and without proof we cannot assume it to be true. It is not pretended that they have not honestly and faithfully performed every trust which was reposed in them, and their testimony is given in a spirit of candour and sincerity, which leaves no room to suspect any purpose to deceive or mislead. We do therefore give full credit to that testimony. It is manifest that they have infinitely better opportunities than any other persons of knowing the
 
 full
 
 mind of old Mr. Jones, in relation to the' disposition of his property confided to their legal care, and the
 
 expressed
 
 wishes of all the parties .for whom they undertook the trusts. And it would be extremely dangerous to the security of property, were we to hesitate a moment in giving effect to solemn instruments, deliberately executed, which we have been assured by those, who had the best means of knowing and who are worthy of all reliance, have been carefully and advisedly drawn according to the disclosed purposes of the parties thereto, because of parts of conversations, seemingly not consistent therewith, perhaps misunderstood, or imperfectly recollected by bystanders. The deed of the 15th August declares that, during the life of the old man, the
 
 title
 
 of the property designed for the children shall be in the trustees, permitting them to
 
 lend
 
 an equal part thereof to any ot them for such time as they may think proper. This provision is obviously intended to secure this property from being liable for the debts of the children during the old man’s life, and its effect is, that, while it declares the title or legal estate to be in the trustees, it leaves in the donor the beneficial ownership (subject to these loans) of all the property during his life. There is also an express condition, that, on failure of the trustees acting in behalf of the children to perform any oí the duties enjoined, the instrument shall become void. These were the provisions, to which the trustees referred in the conversation to which Mr.
 
 *52
 
 John Coor Pender has deposed, and we have not a suspicion that they misrepresented in any way the character of the instrument.
 

 It next tQ {-,e considered, what are the obligations in a court of conscience imposed upon the younger Arthur Jones, in relation to the dispositions of property contained in these deeds. Notwithstanding it has been established that the deed of gift of April, 1827, was delivered before the transactions of August, 1829, so as to convey to the son the legal estate in the negroes therein contained, there is a mystery yet hanging over that instrument which it is not easy to penetrate. It was not
 
 executed
 
 at the time it bears date. The witness Coor proves no delivery or acknowledgment of a delivery, and the singular form of attestation annexed shews that the witnesses subscribing did not mean to attest the
 
 execution
 
 of it. The instrument contains some gilts, which are
 
 testamentary
 
 in their character, viz : of the $3000 in money, and sundry barrels
 
 of corn
 
 to be paid and delivered by the executors of the donor. The instrument is admitted to be subject to a condition or stipulation not expressed therein, that it was not to take effect in
 
 possession,
 
 until after the death of the donor. No one knows what passed between the father and his son, when the former first put it info the hands of the latter. But one thing is indisputable, that the
 
 former claimed
 
 the right to destroy it at any time while he lived, and the latter,
 
 if he
 
 did not directly acknowledge that right, cheated his father with the belief that he had exercised it, and with the assent of his son. It is not true, therefore, as stated in the answer.of the defendant, that his father held possession of the property mentioned in this deed of April, 1827, as
 
 his
 
 bailee; he knew that his father held it, and claimed to hold it, as his own property. With a full knowldge of the understanding, whatever it was, under which the deed was delivered, of the claim of his father of a right to revoke it, of the trick by which he had induced his father to believe that it was destroyed and detroyed with his
 
 assent,
 
 he deliberately and advisedly enters into a solemn contract, under his hand and seal with his fa
 
 *53
 
 ther and the other members of his father’s family, for a dis tribution of all the father’s property, including that which had been given by the deed as
 
 avowedly a fart thereof,
 
 between the father, himself and the rest of the family during his father’s life, thereby obtaining and receiving valuable immediate interests to himself, and also for an equal division of
 
 all
 
 the property between himself and the other members of the family after his father’s death. He then had in his possession the deed of April, 1S27, but no other of the parties knew or believed it was in existence. He knew, that, if he disclosed that fact, the contract would not be made, he would not obtain the immediate benefits thereby secured to him. and he had reason to fear that hé might be compelled by his father to surrender the deed, and therefore he conceals the deed ; but, as a cunning contrivance by which, while he should get the benefits of the settlement, he might be enabled at a future day to upturn it altogether, threw out an ambiguous threat that “they .were not getting as rich as they expected.” He was bound upon every principle of common honesty and fair dealing, if he meant to claim under the deed, ¿Am to assert that claim and to produce the deed. If he had done so and had afterwards entered into the contract, had actually executed one of the deeds, concurred in the execution of the other, resumed the property allotted to him, arid finally declared his entire satisfaction therewith, undoubtedly the contract would have been upheld in Eqnity as a compromise of disputed rights, a fair, reasonable arrangement made for value and providing for the peace and harmony of the family. And it cannot, we think, be for a moment admitted, that the contract is less binding upon him, because of this his fraud and deception.
 

 Holding, as we do, that the arrangement made by the deeds of the 11th and 15th of August, 1829, is one which bound the conscience of the original defendant, and which a Court of Equity will not-permit him to contravene, we think it clear that the-subsequent acknowledgment by his father of the said deed of gift, in no manner released him from the force of that obligation. We enter not into a con
 
 *54
 
 sideration of the motives which induced the father, when he unexpectedly discovered that the deed of gift was not de- , , , , . ^ stroyed, to acknowledge its execution — except to say that there is
 
 no evidence
 
 on the one side of undue practices on the aged man to seduce him into such an acknowledgment, or on the other of any act, omission or failure of duty on the part of the trustees, which, according to the terms of the deed of the 15th of August, 1829, enabled him to make it.
 
 Thai
 
 deed was effectual to pass the property to the trustees upon the trusts therein declared, and no act, unauthorized thereby, could impair its effect.
 

 It has been suggested on the hearing that the bill was defective, because the trustees ought to have been made parties thereto. We think the objection unfounded. They have executed all their trusts, and have no longer any interest or concern in the subject matter of the controversy.
 

 It is the opinion of the court that the plaintiff is entitled to restitution of whatever he
 
 lias lost
 
 by reason of the recovery-at law against him, and to be quieted in the title and possession of the negro claimed by him.
 

 Per Curiam, Decreed accordingly.